IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2016

**STATE OF TENNESSEE v. CEDRIC JONES**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1532     Cheryl A. Blackburn, Judge**

_____

**No. M2015-00720-CCA-R3-CD – Filed June 29, 2016**

_____

Defendant, Cedric Jones, appeals his convictions for three counts of aggravated rape, one count of aggravated sexual battery, and one count of aggravated kidnapping and his total effective sentence of thirty-seven years.  Defendant argues (1) that the evidence is insufficient to sustain his convictions; (2) that the trial court erred when it revoked his bond for failure to appear; (3) that the trial court erred when it denied his motions for recusal; (4) that the trial court erred when it did not allow Defendant to represent himself at trial; (5) that the State committed prosecutorial misconduct during closing argument; and (6) that the trial court erred during sentencing.  Upon our thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Elaine Heard (on appeal) and Jack Byrd (at trial), Nashville, Tennessee, for the appellant, Cedric Jones.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Kristen Menke and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*[1]

On June 18, 2010, Defendant was indicted by the Davidson County Grand Jury on four counts of aggravated rape and one count of aggravated kidnapping for crimes committed against his fourteen-year old daughter, the victim.[2]

After the victim came home from school on March 1, 2010, Defendant told her that he was going to take her to get her nails done. After they left the house, Defendant drove the victim to a storage unit that he used as a recording studio. The victim asked what they were doing there, and Defendant did not respond. The victim sat on a futon inside the storage unit while Defendant played music on his computer. The victim "noticed the songs he was playing were really depressing." The victim described Defendant as "acting really depressed" and "upset." Defendant told the victim that he wanted to kill himself. The victim believed him and started crying. After talking for about an hour, Defendant went to the car and retrieved a small case. Defendant opened the case and showed the victim his gun. Defendant wanted the victim to know the gun was real, so he placed it on her thigh along with the bullets. Defendant told the victim that he was going to use the gun on himself and not her.

The victim tried to talk Defendant out of killing himself, promising not to tell anyone about his suicide threat so that he would not be sent to a mental institution. After several hours of crying and pleading, the victim developed a migraine headache. Defendant went to get the victim some medicine and told her not to leave or he would shoot himself. When Defendant returned, he instructed the victim to take the medicine with a wine cooler he brought to her. The victim told Defendant that she did not want to drink. Defendant placed the gun to his head and threatened to "shoot his brains out" if she did not drink the wine cooler. Defendant made the victim drink four or six bottles of wine coolers. After threatening to shoot himself if she left, Defendant went out to the car and retrieved a larger bottle of alcohol. When the victim refused to drink it, Defendant stated "if you hate me so much, then why don't you just pull the trigger." Defendant then placed the gun in his mouth and put the victim's hand on the trigger. The victim knew the gun was loaded, so she pulled her hand away and agreed to drink the larger bottle. The victim started "feeling sick and dizzy."

The victim asked Defendant to take her home so they could watch a movie, and Defendant agreed. However, when they got to the house, Defendant told the victim that he set an alarm on the car and that he would shoot himself if she got out. The victim was concerned about Defendant shooting himself in front of her siblings, so she stayed in the

---

[1] The procedural history of issues specifically raised by Defendant on appeal is discussed more thoroughly in the Analysis section below.

[2] It is the policy of this Court to protect the identities of minor victims.

car. Defendant returned to the car with a blanket and a laptop. They went back to the storage unit, laid down on the futon, and watched a movie on the laptop. The victim eventually fell asleep.

When the victim awoke, it was very late and dark. The victim noticed that her legs felt wet, and Defendant told her that she urinated on herself. Defendant then got on top of the victim. When the victim asked what he was doing, Defendant stated, "Shut up. You're going to let me do this." Defendant lifted the victim's shirt and started kissing and licking her breasts. The victim was confused and crying. She tried to get up, but Defendant held her down. Defendant then took her pants off. The victim started screaming, and Defendant put his hand over the victim's nose and mouth to the point that she couldn't breathe. When Defendant finally let go, the victim asked if he was going to kill her. Defendant told her "no . . . just do what I say."

Defendant inserted his fingers into the victim's vagina, "pulling them in and out." The victim cried and told Defendant that it hurt, and Defendant told her that it did not. Defendant then asked if she had "ever been eaten out before" and told her that she was "fixing to find out what that feels like." Defendant put his mouth on the victim's vagina and started licking it. Defendant asked the victim if she knew what an orgasm was and told her that he wanted her to have one in his mouth. Defendant pulled down his pants and inserted his penis in the victim's vagina. Defendant then told the victim to get on top of him, and he inserted his penis in her vagina again. Defendant then turned on the lights and told the victim to bend over so that he could look at her body. Defendant licked his fingers and rubbed them against the victim's vagina. Defendant then said, "It's your turn," and the victim knew what he meant. Defendant inserted his penis into the victim's mouth. Defendant ejaculated in the victim's mouth and told her that he wanted her to swallow it. The victim spit some of it out on the futon but swallowed some of it.

Defendant got dressed and went out to the car, telling the victim that he would kill himself if she left. The victim decided to try to escape. She lifted the garage-style door of the storage unit and rolled under it. She then ran to a different door from the one the Defendant was using. She ran up a hill and tried to climb the fence. Defendant ran after her and screamed her name. Defendant grabbed the victim's arm, and the victim fell off the fence. Defendant said, "Did you think you could run from me," and took the victim to the car. Defendant then told the victim he was going to take her home and "acted like nothing happened, like he just – like he didn't do anything."

Defendant took a longer route driving back to the house. Defendant made comments to the victim such as, "I know you liked it," "I could feel you getting into it," "you taste good," and "you're better than your mom was." Defendant told the victim that he had planned all of it and that on several occasions prior to this incident, he had touched her while she slept. The victim told Defendant that she felt sick and then threw

up outside the window of the car. Defendant showed the victim a letter to his family that was on his laptop; the victim did not read it but remembered seeing a paragraph where Defendant stated that "he did some things involving [the victim] that he wasn't proud of." Defendant also told the victim that this was the last time she would see him and tried to give her a credit card.

Defendant and the victim returned home around 7:00 a.m. on March 2, 2010. The victim ran inside the house, woke up her sister, and told her, "Dad just raped me." They used their brother's phone to call their mother, who was living in Iowa, and their mother called the police. The victim took a shower before the police arrived. The victim told the police what happened and gave them the clothes she was wearing. She told the police that she did not know where Defendant was and that he had a gun and was threatening to kill himself. The victim then went to the hospital for an exam.

On cross-examination, the victim admitted that Defendant never pointed the gun directly at her and that he only threatened to use it on himself. The victim also testified that the storage locker could not be locked from the inside. The victim testified that she and Defendant drank four small bottles of alcohol and one large bottle. She testified that the alcohol made her feel light-headed but that she was not intoxicated.

Several police officers from Davidson and Rutherford County testified about the effort to locate Defendant after this incident. The officers were advised that Defendant was armed and that he was threatening to kill himself. Defendant was located at a McDonald's restaurant in La Vergne. Defendant showed the officers the unloaded gun in the trunk of his car and the magazine in the glove compartment. Other officers responded to the storage unit to gather evidence. They collected a blanket, a pillow, a pair of men's underwear, a washcloth, a pistol magazine, a pair of handcuffs, and several liquor bottles from the storage unit. Officers also obtained video surveillance of the storage unit facility as well as a log showing entries and exits through the secured gate.

Detective Robert Carrigan of the Metropolitan Nashville Police Department was the lead detective on the case. He secured a search warrant for the storage facility, supervised the collection of evidence, and reviewed the surveillance footage. Several still photographs from the surveillance video were displayed to the jury, showing Defendant entering and exiting the storage facility several times during the evening of March 1 and the early morning hours of March 2, 2010. In one image, time-stamped 3:58 a.m., a female passenger can be seen in the back of Defendant's car while he is exiting the storage facility. Detective Carrigan also obtained a search warrant for the collection of Defendant's DNA and swabs from his body.

Hollye Gallion, a nurse practitioner and clinical director at Our Kids' Center, testified as an expert in the field of pediatric nursing and forensic examination. Ms.

Gallion did not conduct the forensic examination of the victim but had reviewed the medical record. The record reflected that a swab from the victim's vagina did not show the presence of sperm. The victim also did not show any signs of injury to her genital area. Ms. Gallion explained that a lack of injury is not uncommon due to the elasticity of the area. A blood alcohol test was conducted on the victim, which came back negative.

Chad Johnson, a forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in the field of serology and DNA testing. Agent Johnson analyzed swabs taken from Defendant's and the victim's bodies. Saliva was found on the swabs taken from Defendant's penis; DNA on the swab indicated that the saliva came from a female, but the sample was either too degraded or insufficient to obtain a genetic match. Saliva was also found on the vaginal swabs taken from the victim, but the DNA only revealed a partial profile consistent with the victim. Semen was not detected on either the victim's oral or vaginal swabs. Two pairs of men's underwear were also tested, both of which revealed a mixture of Defendant's and the victim's DNA. The victim and Defendant were equal contributors on the pair recovered from Defendant at the hospital, while the victim was the major contributor on the pair found in the storage unit. Agent Johnson testified that the TBI did not test all of the items submitted, including the futon cover and blanket.

For the election of offenses, the State elected to charge in Count One, Defendant's digital penetration of the victim's vagina; in Count Two, Defendant's performing cunniligus on the victim; in Count Three, Defendant's penile penetration of the victim's vagina; and in Count Four, Defendant's penile penetration of the victim's mouth. Defendant chose not to testify or put on any additional proof.

Defendant was convicted of the lesser-included offense of aggravated sexual battery in Count One and was convicted as charged on the remaining counts. The jury imposed fines totaling $200,000. After a sentencing hearing, Defendant was sentenced to twenty-five years on each count of aggravated rape and twelve years for aggravated sexual battery, to run concurrently with one another. He was sentenced to an additional twelve years for aggravated kidnapping, which was ordered to be served consecutively to the other counts, for a total effective sentence of thirty-seven years to be served at 100% in the Tennessee Department of Correction.

On May 7, 2013, trial counsel filed a timely motion for new trial as well as a motion to withdraw. The trial court granted the motion to withdraw and granted Defendant's request to proceed pro se, appointing appellate counsel to serve as "elbow" counsel. The trial court held several status hearings over the course of a year to assist Defendant in preparing his motion for new trial. At a status hearing on June 6, 2014, the

trial court consolidated several pro se pleadings filed by Defendant in different courts[3] and set a date for the hearing on the motion for new trial. Subsequently, Defendant filed a document with the trial court indicating his desire to be represented by appellate counsel, who was then appointed by the trial court. Appellate counsel filed a motion for new trial on July 9, 2014, and an amended motion for new trial on July 30, 2014. After a hearing, the trial court denied Defendant's motion for new trial by written order on September 24, 2014. On May 1, 2015, this Court entered an order allowing Defendant to late-file his notice of appeal, which was subsequently filed on May 14, 2015.

*Analysis*

*I. Sufficiency of the Evidence*

Defendant contends that the evidence adduced at trial is insufficient to support his convictions for aggravated rape and aggravated kidnapping.[4] Specifically, as to the aggravated rape convictions, Defendant argues that the State failed to prove that the Defendant used force or coercion and that he was armed with a weapon because the testimony indicated that he did not point the gun directly at the victim. As to the aggravated kidnapping conviction, Defendant argues that the victim was not confined to the storage unit because the testimony indicated that it was not locked. The State disagrees, arguing that the jury's verdict is supported by the victim's explicit testimony.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)).

---

[3] In addition to the motion for new trial pending in the trial court (Davidson County Criminal Court Division III), Defendant filed a "Petition for Writ of Habeas Corpus & Motion for New Trial and or for Judgment of Acquittal" in Davidson County Circuit Court as well as a "Supplemental Petition for a Writ of Habeas Corpus, Motion for New Trial and Change of Venue" in Davidson County Criminal Court Division II.

[4] Defendant does not challenge his conviction for aggravated sexual battery.

"'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

As relevant to this case, aggravated rape is defined as the unlawful sexual penetration of a victim by the defendant accomplished through force or coercion and while the defendant is armed with a weapon. T.C.A. § 39-13-502(a)(1). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body, but emission of semen is not required." T.C.A. § 39-13-501(7). Aggravated kidnapping is defined as false imprisonment committed while the defendant is in possession of a deadly weapon or threatens use of a deadly weapon. T.C.A. § 39-13-304(a)(5). False imprisonment is defined as knowingly removing or confining another unlawfully so as to interfere substantially with the other's liberty. T.C.A. § 39-13-302(a). Pursuant to *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012), the removal or confinement of the victim must exceed that which is necessary to accomplish an accompanying felony, such as rape.

In the light most favorable to the State, the evidence in this case showed that Defendant lured the victim, his fourteen-year-old daughter, out of the house with the false pretense of getting her nails done and took her to a storage unit that he used as a music studio. Once there, Defendant told the victim that he was going to kill himself and placed a gun on her lap so that she would know that it was real. The victim cried and pleaded with Defendant to the point that she developed a migraine headache. As Defendant left to get her some medicine, he told her that he would kill himself if she left the storage unit. When Defendant returned, he brought not only the headache medicine but also several wine coolers. He forced the victim to drink the wine coolers by again threatening to take his own life. Defendant placed the gun in his mouth and put the victim's hand on the trigger. At one point, Defendant and the victim did leave the storage unit and drove home, but Defendant told the victim that he had set an alarm on the car and would kill himself in front of her siblings if she got out of the car. Defendant then drove the victim back to the storage unit, where they watched a movie until the victim fell asleep.

When the victim awoke, Defendant got on top of her, lifted her shirt, and started kissing her breasts. The victim cried and screamed. Defendant held her down and covered her nose and mouth with his hand to the point that she could not breathe. Defendant penetrated the victim's vagina with his fingers. The victim told him that it

hurt, and Defendant told her that it did not. Defendant then performed cunnilingus on the victim and told her that he wanted her to have an orgasm in his mouth. Defendant then penetrated the victim's vagina with his penis. Defendant rolled over, made the victim get on top of him, and penetrated her vagina with his penis again. Defendant turned on the lights so that he could see the victim's body. He licked his fingers and rubbed her vagina. Then, Defendant told the victim, "It's your turn," and inserted his penis into her mouth. Defendant ejaculated in the victim's mouth and told her to swallow it. After this ordeal and despite Defendant's repeated threats to kill himself, the victim tried to flee from the storage unit. Defendant caught the victim while she was climbing a fence and took her back to the car. On the drive home, Defendant made comments to the victim that he had planned the entire incident.

Forensic testing revealed the presence of saliva on Defendant's penis, which DNA testing indicated belonged to a female. Saliva was also detected in the victim's vagina. A mixture of both the victim's and Defendant's DNA was found on a pair of men's underwear found in the storage unit as well as on the pair of underwear Defendant was wearing when he was apprehended.

As to the aggravated rapes, Defendant argues that the State failed to prove either that Defendant was armed with a weapon or that he used force or coercion because he never pointed the gun at the victim. Defendant clearly used force when he held the victim down and placed his hand over her nose and mouth to the point that she could not breathe. "Coercion" is defined as a "threat of . . . force or violence to be performed immediately or in the future or the use of parental . . . authority over a child less than fifteen (15) years of age." T.C.A. § 39-13-501. Defendant certainly used his parental authority over the fourteen-year-old victim to lure her to the storage unit and keep her there by threatening to kill himself. Therefore, even though Defendant did not point the gun at the victim, the evidence supports a finding that Defendant used both force and coercion to accomplish the sexual penetration of the victim.

As for the element of being armed with a weapon, this Court has held that this element is satisfied when a defendant has a weapon in his actual or constructive possession. *See State v. Moore*, 703 S.W.2d 183, 186 (Tenn. Crim. App. 1985). The statute does not require that a defendant employ the weapon or directly threaten the victim with the weapon. Defendant had the gun in his possession, showed it to the victim, placed it in her lap so that she would know that it was real, and threatened to use the gun on himself several times both before and after the rapes. Defendant was clearly armed with a weapon. The evidence was crushingly sufficient to sustain each count of aggravated rape.

As to the conviction for aggravated kidnapping, Defendant argues that the victim was not confined to the storage unit because the door was not locked. Defendant points

out the fact that he left the victim unattended in the unlocked storage unit multiple times and that one time she even left the storage unit with Defendant and remained in the unlocked car while Defendant retrieved a movie from the house. However, the victim testified that she remained in the storage unit and in the car because of Defendant's threats that he would shoot himself if she left. The victim believed Defendant's multiple threats to kill himself because he had previously threatened suicide. These threats especially resonated with the victim because Defendant was her biological father and had sole custody of the victim and her siblings. The victim's testimony, which was accredited by the jury, more than adequately establishes that Defendant unlawfully confined the victim to the storage unit, substantially interfering with her liberty. Additionally, as explained above, Defendant was in possession of a deadly weapon while he confined the victim to the storage unit. Therefore, the evidence is sufficient to sustain Defendant's conviction for aggravated kidnapping.

## II. *Revocation of Bail*

When Defendant's case was bound over to the Grand Jury, his bond was set at $250,000. Defendant filed a motion to reduce bond, which was granted after a hearing on June 3, 2011.[5] Subsequently, Defendant was released on bail with the condition that he be placed on GPS monitoring. The trial in this matter was originally scheduled for May 14, 2012. After removing his electronic monitoring device, Defendant failed to appear. Defendant's whereabouts were unknown for four days. After Defendant was apprehended, the trial court revoked his bond. Defendant did not file a motion to review the trial court's decision to revoke his bond in either the trial court or this Court.

The Tennessee Constitution guarantees a defendant the right to pretrial release on bail pending the adjudication of criminal charges. *See* Tenn. Const. art I, § 15; *Swain v. State*, 527 S.W.2d 119, 120 (Tenn. 1975). Under Tennessee Code Annotated section 40-11-141(a), "[a] defendant released before trial shall continue on release during trial" under terms and conditions set by the trial court to ensure the defendant's appearance at trial or to ensure that the defendant will not prevent the progression of the trial. However, if a defendant violates a condition of release, the trial court may revoke the defendant's bond and order the defendant to be held without bail during the pendency of the trial. T.C.A. § 40-11-141(b).

The proper method for challenging a bond revocation is to file a written motion for review in the trial court. Tenn. R. App. P. 8(a). The purpose of Rule 8 is to ensure "the expeditious review of release orders." *Id.*, Advisory Comm'n Cmts. Moreover, "our

---

[5] The transcripts of the motion to reduce bond hearing held on June 3, 2011, and the bond source hearing held on June 22, 2011, are not in the record on appeal. The facts surrounding these hearings are gleaned from the trial court's order denying Defendant's motion to recuse, discussed further below.

supreme court has said that it also is the 'only effective remedy' for 'addressing unsatisfactory release orders.'" *State v. Moore*, 262 S.W.3d 767, 771 (Tenn. Crim. App. 2008) (quoting *State v. Melson*, 638 S.W.2d 342, 358 (Tenn. 1982)). A defendant must promptly appeal the trial court's decision on the motion to review rather than wait to raise the issue after conviction. *Melson*, 638 S.W.2d at 358 ("The appeal of this issue at this point is of no practical effect or benefit to the defendant."). Failure to follow the procedure set out in Rule 8 waives the issue on appeal. *See State v. Melvin J. Branham*, No. E2013-00638-CCA-R3-CD, 2014 WL 869552, at *6 (Tenn. Crim. App. Mar. 4, 2014), *perm. app. denied* (Tenn. Sept. 24, 2014); *State v. Joshua Meeks*, No. M2008-00556-CCA-R3-CD, 2009 WL 1748927, at *10 (Tenn. Crim. App. June 22, 2009), *perm. app. denied* (Tenn. Oct. 19, 2009); *State v. Paul Graham Manning*, No. M2002-00547-CCA-R3-CD, 2003 WL 354510, at *10 (Tenn. Crim. App. Feb. 14, 2003), *perm. app. denied* (Tenn. Dec. 15, 2003). Because Defendant failed to follow the proper procedure, this issue is waived.

### III.  Motion to Recuse

Throughout the proceedings before the trial court, Defendant filed several motions to recuse the trial judge. The first, dated February 25, 2013, was filed by Defendant through trial counsel. As grounds, Defendant cited a civil action in federal court that he had filed against the trial judge. Defendant's federal complaint was based on the trial court's rulings during his earlier bond proceedings. The trial court filed a detailed order denying the motion on February 26, 2013. The trial court noted that Defendant's case had been pending since 2010, that he had been represented by four different attorneys,[6] that his trial date had been continued twice, and that Defendant's motion was filed approximately one week before the latest trial date. The trial court determined that the motion to recuse was neither timely filed nor meritorious. Defendant filed a pro se petition for an interlocutory appeal, which was denied by this Court on the ground that Defendant was not permitted to file an appeal pro se while simultaneously being represented by counsel. *See State v. Cedric Jones*, No. M2013-00661-CCA-10B-CD (Tenn. Crim. App. Mar. 20, 2013) (order).

---

[6] According to the record, Defendant was originally represented by the Public Defender's Office. The public defender was allowed to withdraw when Defendant refused to cooperate with counsel. A second attorney was appointed, and the case was set for trial. In the meantime, Defendant filed a petition for habeas corpus relief in federal court, alleging the ineffective assistance of his second attorney; the trial court allowed the second attorney to withdraw. Based on evidence received during Defendant's bond source hearing, the trial court determined that Defendant was not indigent and did not appoint another attorney. Defendant then retained a third attorney, who filed a motion to continue the previously set trial date so that he could familiarize himself with Defendant's case. After Defendant failed to appear for the scheduled trial date and was taken into custody, the third attorney moved to withdraw. The trial court granted the motion, appointed trial counsel, and set a third trial date.

Defendant, acting pro se, filed further motions after his trial. Defendant filed a second motion to recuse and an amended motion to recuse in July 2013, which were denied by the trial court on July 16, 2013. Defendant did not seek an appeal of that order in this Court. On November 20, 2013, Defendant filed a motion challenging the trial court's jurisdiction. The trial court denied the motion on November 22, 2013, and directed Defendant to raise any issues in his motion for new trial. Defendant again did not seek an appeal in this Court.

The third motion to recuse was filed on December 12, 2013, and was denied by the trial court "for the same reasons articulated in the previous orders." Defendant appealed the trial court's ruling to this Court. *See State v. Cedric Jones*, No. M2013-02831-CCA-T10B-CO (Tenn. Crim. App. Jan. 16, 2014) (order). This Court entered an order denying Defendant's appeal on the procedural ground that Defendant failed to attach all relevant trial court orders for an adequate de novo review. Furthermore, this Court addressed the merits of Defendant's appeal, finding that he was "merely unsatisfied with some of the trial court's rulings." *Id.* Defendant appealed this Court's decision to the Tennessee Supreme Court, which denied his application for permission to appeal. *See State v. Cedric Jones*, No. M2013-02831-SC-A10B-CO (Tenn. May 19, 2014) (order).

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002). "A judge should grant a motion to recuse when the judge has any doubt as to his or her ability to preside impartially in the case or when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Smith v. State*, 357 S.W.3d 322, 341 (Tenn. 2011) (internal quotation omitted). Whether a judge should recuse himself or herself from a legal proceeding rests within the sound discretion of the judge and will not be reversed on appeal "unless clear abuse appears on the face of the record." *State v. Reid*, 213 S.W.3d 792, 815 (Tenn. 2006).

This Court has previously held that "[a]dverse rulings by a trial court are not usually sufficient grounds to establish bias." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994). Furthermore, a defendant's "filing of a lawsuit against the trial judge is normally insufficient to warrant recusal." *State v. Parton*, 817 S.W.2d 28, 29-30 (Tenn. Crim. App. 1991). To hold otherwise would mean that a defendant could automatically disqualify a judge by filing a frivolous suit, inviting additional frivolous litigation, manipulation of the judicial system, and forum shopping. *See State v. Parsons*, 437 S.W.3d 457, 483 n.18 (Tenn. Crim. App. 2011). Additionally, "motions to recuse must be filed promptly after the facts forming the basis for the motion become known . . . and the failure to seek recusal in a timely manner results in a waiver of a party's right to

question a judge's impartiality." *Lofton v. Lofton*, 345 S.W.3d 913, 917 (Tenn. Ct. App. 2008) (internal quotation omitted).

In this case, Defendant's various motions to recuse were based on the trial court's statements and rulings during the earlier bond proceedings. Defendant waited almost two years after the bond proceedings to file his first motion, filing it the week before the scheduled trial date. Defendant's second and third motions, which both merely raised the same issues as the first motion, were filed several months after the trial. Our "[c]ourts frown upon the manipulation of the impartiality issue to gain procedural advantage and will not permit litigants to refrain from asserting known grounds for disqualification in order 'to experiment with the court . . . and raise the objection later when the result of the trial is unfavorable.'" *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998) (quoting *Holmes v. Eason*, 76 Tenn. 754, 757 (1882)). Furthermore, neither the trial court's adverse rulings nor the filing of a federal lawsuit against the judge are sufficient grounds to disqualify the judge. Moreover, Defendant has failed to include the transcripts of the bond proceedings that form the basis of his motions to recuse, precluding our review of the issue. *See State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993) (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988); Tenn. R. App. P. 24(b)). Defendant is not entitled to relief.

## IV. *Request to Proceed Pro Se*

Defendant argues that the trial court erred when it denied his request to represent himself at trial. Specifically, Defendant contends that the trial court's finding that his request was merely a delay tactic is not supported by the record. The State responds that the issue should be waived for Defendant's failure to provide an adequate appellate record. We agree with the State.

An appellant bears the burden of preparing an adequate record for appellate review. *Ballard*, 855 S.W.2d at 560. "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." *Id*. at 560-61. In the absence of an adequate record, this Court must presume that the trial court's ruling is correct. *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993).

In this case, the only reference to this issue appears in the trial court's order denying Defendant's motion for new trial. The trial court addressed the issue as follows:

> Defendant requested to proceed *pro se* on the Friday before his trial. This Court found that it was too late for him to assert this request and that he was doing so as a delay tactic. This Court incorporates its reasoning made

from the bench during the March 1, 2013 pre-trial status [hearing]. The Court finds no basis to grant a new trial as to this claim.

The appellate record does not contain either Defendant's initial request to represent himself at trial or a transcript of the March 1, 2013 hearing when the trial court ruled on the matter.

When a defendant wishes to waive the right to counsel and proceed pro se, (1) he must make the request in a timely manner; (2) the assertion of the right to self-representation must be clear and unequivocal; and (3) the assertion must reflect a knowing an intelligent waiver of the right to counsel. *State v. Hester*, 324 S.W.3d 1, 30-31 (Tenn. 2010). Furthermore, a defendant "must waive his or her right to counsel in writing, and this writing must be included in the record." *Id*. at 31 (internal citations omitted). Without having in the record a written request file-stamped by the clerk, we have no way of knowing whether Defendant's assertion of his right to represent himself met any of the above requirements. Additionally, a defendant may not exercise his right to self-representation "as a tactic for delay, for disruption, for distortion of the system, or for the manipulation of the trial process." *Id*. (internal quotation omitted). Without the transcript of the March 1, 2013 hearing, we must presume that the trial court was correct when it ruled that Defendant's request, made three days before the scheduled trial date, was merely a delay tactic. Defendant is not entitled to relief.

## V. Prosecutorial Misconduct During Closing Argument

Defendant argues that the prosecutor committed prosecutorial misconduct during closing arguments. Specifically, Defendant contends that the prosecutor misstated the evidence when she said the following:

You all heard the testimony that [Defendant] showed this [weapon] to [the victim]. He put it on her thigh, he made her look at the live ammunition rounds that he had for it, he made her feel the weight of it, he put her finger on the trigger while he held it in her (sic) mouth.

The State responds that the issue is waived because Defendant failed to object to the statement at trial. Furthermore, the State contends that Defendant has not established that he is entitled to plain error relief. We agree with the State.

Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a). The issue of prosecutorial misconduct during closing argument is waived if the defendant does not make a contemporaneous objection. *State v. Robinson*, 146 S.W.3d 469, 518 (Tenn. 2004). Moreover, Defendant's appellate brief

fails to cite any legal authority on this issue, further waiving review. Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

This Court may nonetheless consider a waived issue if the defendant can establish that it constituted plain error. *See* Tenn. R. App. P. 36(b). There are five factors that must be established before an error may be recognized as plain:

> (a) the record clearly establishes what occurred in the trial court; (b) a clear and unequivocal rule of law was breached; (c) a substantial right of the accused was adversely affected; (d) the accused did not waive the right for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The burden is on the defendant to establish all five factors, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. Furthermore, the error must be "clear" or "obvious," *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and must be of "such a great magnitude that it probably changed the outcome of the trial," *Smith*, 24 S.W.3d at 283.

In this case, the record does not clearly establish what happened in the trial court. The transcript of the prosecutor's closing argument reads, "he put her finger on the trigger while he held it in her (sic) mouth." The transcript's use of "sic" renders the meaning of this passage unclear. The use of "sic" could indicate that the prosecutor misspoke or that the court reporter was not certain which pronoun the prosecutor used. Even if the prosecutor misspoke and stated that Defendant held the gun in "her mouth" rather than "his mouth," Defendant has not shown that this error is substantial enough that it probably changed the outcome of the trial. From the context of the rest of the prosecutor's closing argument, it is clear that she was arguing to the jury that Defendant's multiple suicide threats and possession of the gun satisfied the element of being armed with a deadly weapon; she was not arguing that Defendant threatened the victim with the gun directly. The State's proof in this case was overwhelming, and Defendant has not shown how this misstatement may have affected the jury's verdict. Defendant is not entitled to plain error relief.

*VI. Sentencing*

Defendant raises several challenges with regard to his sentencing. First, he argues that the trial court erred when it considered an email purportedly written by the victim. Next, he argues that the trial court erred when it gave no weight to the mitigating factor that Defendant's conduct neither caused nor threatened serious bodily injury and its

finding that a migraine headache is a serious bodily injury. Finally, Defendant argues that the trial court erred in imposing consecutive sentences. The State responds that Defendant failed to object to the admission of the email in question and that the trial court properly exercised its discretion in weighing the sentencing factors and in imposing partially consecutive sentences.

When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In imposing a sentence, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the defendant in his own behalf. T.C.A. § 40-35-210(b). In addition, the principles of sentencing provide that the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. *See* T.C.A. § 40-35-103(2), (4). To provide meaningful appellate review, the trial court must state on the record its reasons for the sentence chosen. T.C.A. § 40-35-210(e).

### A. Admission of Email from the Victim

During the sentencing hearing, the prosecutor informed the trial court that she had received an email sent from the victim's mother's email account. The email states that it was written by the victim. It reads,

> My feelings today concerning my dad's sentencing is disturbing. I love him very much, but at the same time he does need punishment for what he did to me. But I don't feel he should get life in prison. He deserves at least ten to fifteen years.

The trial court noted that the email "could be from somebody else" but that it was "asking for mercy for her father" and that the court would "take that for what it's worth." Defendant did not object to the admission of the email. The failure to object waives the issue on appeal, Tenn. R. App. P. 36(a), and Defendant has not shown any type of prejudice from the trial court's consideration of a request for less time than what was ultimately imposed, *see Smith*, 24 S.W.3d at 282 (holding that one of the factors for plain error relief is that "a substantial right of the accused was *adversely* affected" (emphasis added)). In fact, trial counsel relied upon the email's request for leniency during his argument at the sentencing hearing, indicating that the failure to object may have been a tactical decision. *See id.* (holding that one of the additional factors for plain error relief is that "the accused did not waive the right for tactical reasons"). Defendant is not entitled to relief.

## B. *Mitigating and Enhancement Factors*

"[A] trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act.'" *Carter*, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)). The trial court shall consider, but is not bound by, the provision that "[t]he minimum sentence within the range of punishment is the sentence that should be imposed . . . [and] should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors." T.C.A. § 40-35-210(c); *Carter*, 254 S.W.3d at 346. A non-exclusive list of mitigating and enhancement factors are provided in Tennessee Code Annotated sections 40-35-113 and -114. The weighing of both mitigating and enhancement factors is left to the trial court's sound discretion, but a trial court's misapplication of a mitigating or enhancement factor will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

In this case, the trial court conducted a lengthy analysis of the relevant sentencing considerations and the applicable mitigating and enhancement factors. Defendant's only complaint is that the trial court discounted his reliance on Tennessee Code Annotated section 40-35-113(1)—that his conduct neither caused nor threatened serious bodily injury—as a mitigating factor because the victim developed a migraine headache. Defendant does not challenge the trial court's application of three enhancement factors: that Defendant treated the victim with exceptional cruelty, T.C.A. 40-35-114(5); that the offense was committed to gratify Defendant's desire for pleasure or excitement, *id*. at -114(7); and that Defendant abused a position of public or private trust, *id*. at -114(14). While it is arguable whether a migraine headache fits the definition of serious bodily injury, *see* T.C.A. § 39-11-106(34), the trial court did not abuse its discretion in giving no weight to Defendant's proposed mitigating factor. The application of a single enhancement factor is sufficient to justify the imposition of the maximum sentence in the

range, even when mitigating factors are also applied. *See, e.g.*, *State v. James Taylor, Jr.*, No. W2006-02085-CCA-R3-CD, 2007 WL 3391433, at *6 (Tenn. Crim. App. Nov. 14, 2007), *no perm. app. filed*. The sentences imposed are within the appropriate ranges and the record reflects that the trial court adequately considered the purposes and principles of sentencing. *See Bise*, 380 S.W.3d at 709-10. Defendant is not entitled to relief.

## C. Consecutive Sentences

When a defendant has been convicted of multiple crimes, the trial court may order that the sentences be served consecutively if it finds by a preponderance of the evidence that the defendant qualifies under at least one of the seven categories listed in Tennessee Code Annotated section 40-35-115(b). *See Pollard*, 432 S.W.3d at 859-62. A trial court's decision to impose consecutive sentences is presumed reasonable and is reviewed by this Court for an abuse of discretion. *Id.* "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1)); *see also Bise*, 380 S.W.3d at 705.

In this case, the trial court's decision to impose partially consecutive sentences rested on its application of Tennessee Code Annotated section 40-35-115(b)(5)—that the defendant was convicted of two or more statutory offenses involving sexual abuse of a minor. As required for this factor, the trial court considered "the aggravating circumstances arising from the relationship between the defendant and victim . . . , the time span of [the] defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim." *Id.* Defendant has not argued that the trial court erred in its application of this factor. In fact, Defendant's only argument on appeal is that the trial court abused its discretion because the total sentence imposed, thirty-seven years, "amounts to a mandate that the [Defendant] will die in prison." However, we review the trial court's determination with a presumption of reasonableness. The trial court imposed sentences that it deemed to be "justly deserved in relation to the seriousness of the offense[s]." T.C.A. § 40-35-102(1). Without a showing of a clear abuse of discretion, we will not second guess this determination on appeal. Defendant is not entitled to relief.

## Conclusion

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE